UNITED STATES DISTRICT COURT

IN THE EASTERN DISTRICT OF MICHIGAN

SAMMY LEWIS, JOHN MILLER, SHAWNE HENRY,
CHRISTINE SINGLETON, DANIEL HONOWAY,
DANIEL DIDONATO, ROBERTA CAREVIC,
JANET CONFORTO, ANGELA JONES,
and MICHAEL BELLEVILLE,

      Plaintiffs, on behalf of themselves and
       other persons similarly situated

v

DR. PAUL DROUILLARD, a MI resident,
and or UNITED PARCEL SERVICE and or
LIBERTY MUTUAL INSURANCE
COMPANY, foreign corporations,

      Defendants

_____/
Marshall Lasser P25573
MARSHALL LASSER PC
Attorney for plaintiffs
po box 2579
Southfield MI 48037
248-647-7722
_____/

**CIVIL RICO COMPLAINT AND JURY DEMAND, AND REQUEST FOR CLASS
CERTIFICATION**

JURISDICTION AND VENUE

1.     Federal question jurisdiction is conferred by plaintiffs' claims under the Federal

Racketeer Influence and Corrupt Organizations Act, 18 USC §1961 et seq (RICO).  Diversity of

citizenship jurisdiction is conferred by 28 USC §1332 (plaintiffs are citizens of Michigan,

defendants except Dr. Drouillard are citizens of other states, and the amounts in controversy exceed

$75,000).   2.   Venue is properly laid in the Federal District Court for the Eastern District of Michigan because plaintiffs reside in that district and defendants do business in person and through their agents and representatives in that district, in Wayne and Oakland Counties, Michigan.

3.  The predicate acts complained of herein involve interstate commerce and the inter and intrastate use of the United States mails and electronic communications, and mail and wire fraud in violation of 18 USC 1341 and 1343.

## PARTIES

4.   Plaintiffs (John Miller, Shawne Henry, Sammy Lewis, Janet Conforto, Roberta Carevic, Daniel Honoway, Christine Singleton, John Miller, Daniel DiDonato, and Angela Jones) reside within the jurisdiction of this district court.  They were or are employees of United Parcel Service (UPS).  UPS and Liberty Mutual Insurance Company (Liberty) are corporations domiciled outside Michigan.   Dr. Paul Drouillard resides in Michigan, working in Wayne County and residing in or near Wayne County.  John Griffith is an employee of Liberty Mutual who resides in.  Gary Guest is a resident of Michigan who is employed by UPS at its Grand Rapids, MI, offices.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

5.   This case arises under the Racketeer Influenced Corrupt Organizations Act (RICO), 18 U.S.C. 1961 through 1968.

6.   United Parcel Service employed each of the plaintiffs.   It complied with its obligation to provide its Michigan employees Michigan workers disability compensation insurance by signing a contract of insurance with Liberty Mutual Insurance Company.  However, on information and belief, the contract of insurance effectively and perhaps contractually made UPS a self-insured for all or most of its losses.

7. Liberty Mutual Insurance Company adjusted the workers compensation claims out of an office in Indianapolis, IN. On information and belief, UPS adjusted its claims out of its Livonia, Michigan office, and or the Grand Rapids location at which employee Garry Guest worked.

8. Decisions regarding paying claims or terminating payment were made jointly by UPS and Liberty, or were made by Liberty after consulting with UPS, or were ratified by UPS after being made by Liberty. These allegations are based on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery. All Notices of Dispute (NODs) mentioned in this complaint were mailed via the US mails to the injured worker and to the State of Michigan Workers Compensation Agency ("the Agency").

9. **The Enterprise or Enterprises.** (1) The workers compensation personnel at the workers compensation claims departments at UPS and Liberty Mutual who handled Michigan claims and associating in fact formed an "enterprise" for purposes of the Racketeer Influenced and Corrupt Organizations Act (RICO) claims in this case. These persons included, inter alia, Gary Guest, Jennifer Estrada, John Griffith and Carmelo Deogracias. Because they worked together for years in adjusting and handling workers compensation claims for UPS Michigan workers, they formed an organization. The names of other persons in the enterprise are not known to plaintiffs. These allegations are based on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery.

Additionally or alternatively, the following persons or entities are an "enterprise" which acted to defraud plaintiffs of their workers compensation benefits:

(2) the workers compensation claims department at Liberty which handled Michigan claims;

(3) the workers compensation claims department at UPS which handled MI claims;

(4)  the workers compensation claims personnel at Liberty who handled Michigan claims, plus Dr. Drouillard;

(5) the workers compensation claim personnel at UPS and Liberty Mutual handling Michigan claims, plus Dr. Paul Drouillard.

Each enterprise was an organization which existed not only for the purpose of defrauding plaintiffs of their workers compensation benefits; the enterprise engaged in other activities, such as the administration of workers compensation claims and the examination of individuals claiming workers compensation and other benefits.  Each enterprise has existed for many years, and in each enterprise different persons had different roles concerning the conduct of the enterprise, not limited to the commission  of the fraudulent acts complained of herein.

10.  Two or more enterprises may have acted together to defraud one or more plaintiffs of their workers compensation benefits.

11.  If a plaintiff has released UPS and Liberty from a RICO claim, that plaintiff does not sue UPS and Liberty.

12.   One or more of these persons or entities committed mail fraud,  wire fraud and or conspiracy to defraud,  in a repeated and continuing pattern extending over years, by fraudulently terminating or denying benefits, by writing fraudulent medical reports and giving fraudulent deposition testimony, by hiring a doctor such as Paul Drouillard whom defendants knew would frequently give false testimony and or write false medical reports, by failing to honestly and in good faith review a claim as required by Michigan statute before denying the claim, and or by fraudulently terminating benefits because a person refused to settle a claim for the amount offered by UPS and or Liberty Mutual.  Defendants used the mails and wires in furtherance of this scheme, by mailing,

emailing and or faxing Notices of Dispute and other communications.

13. At times this fraud involved UPS's and Liberty's repeated and frequent employment of "cut off" doctors such as Dr. Paul Drouillard, that is, doctors whom UPS and Liberty knew would reliably write them a report stating a claimant did not have a work-related disability whether or not such disability actually existed; UPS and Liberty used these "cut off" reports as a grounds to cut off benefits which were being paid or to deny benefits before any were paid; Liberty then cited the report in a Notice of Dispute filed with the Agency as the grounds for cut off or denial of benefits. Defendants referred to the examinations as "independent medical examinations" (IMEs) but they were not independent because the doctor received tens of thousands or hundreds of thousands of dollars each year from defendants, year after year, and similar amounts of money from other employers and insurers, year after year, to do examinations and related depositions in workers compensation and other insurance cases. On information and belief, defendants, perhaps through their attorneys, communicated with each other concerning the desire of UPS and Liberty to obtain a report which Liberty and UPS could use to cut off or deny workers compensation benefits, or to defeat litigation claiming benefits, and concerning which findings UPS and Liberty and or their lawyers wanted in a report so as to be able to cut off or deny benefits. Liberty and UPS used Dr. Drouillard dozens or scores of times in each of the years 2003-2008 to examine insurance claimants and write cut off reports, and used other cut off doctors. Liberty and UPS made similar communications with other doctors whom they wanted to write cut off reports.

14. Once Liberty and UPS and other defendants obtained a report from Dr. Drouillard, or another cut off doctor, they disregarded or did not honestly and in good faith assess reports and records from a claimant's treating doctors, but instead cut off or denied benefits, citing the cut off

report.

15.  Liberty, UPS and other defendants misrepresented to each of the plaintiffs, through the use of the US mails, that their cut off doctors were doing "independent" medical examinations of the claimants.  UPS and Liberty made hundreds of such misrepresentations to claimants in the years 2003 through 2008. These representations were mailed to plaintiffs.  These representations were false, because the doctors, such as Paul Drouillard, were not independent, in that they earned tens of thousands of dollars, or hundreds of thousands of dollars, each year for many years in a row, from defendants and other employers and workers compensation insurers, doing examinations of injury claimants.  Defendants knew these doctors were not independent but were in fact financially dependent upon them and employers and insurers similarly situated.  Defendants knew these doctors would generally or almost always write a report stating a worker had no work related disability. These allegations are based on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery.

16.     In each of the cases in which they terminated or denied benefits based on the report of a cut off doctor, Liberty and UPS and other defendants acted in bad faith and fraudulently in failing to give any consideration or due consideration to the reports and records of a claimant's treating doctors, once they had received the report of a cut off doctor, such as Dr. Drouillard.  This intentional failure to give honest and good faith consideration to the records and reports of a claimant's treating doctors, and to honestly weigh those records and reports against the report of the cut off doctor, violated a duty owed by Liberty and UPS to the claimant under the Michigan Workers Disability Compensation Act, MCL 418.101 et seq (the Act), to be honest in the administration of a workers compensation claim.  This duty is inherent in the Act; also, MCL

6

418.631 specifically imposes a duty on an insurer or self-insurer not to "unreasonably fail to pay promptly claims for compensation for which it shall become liable." This duty required defendants to weigh in good faith the report of a doctor they hired to examine a claimant against the reports and records of a claimant's treating doctors, and all other medical records, where the treating doctor found a work-related disability. Defendants used the mails and wires in furtherance of this scheme, in violation of 18 USC 1341 and 1343. These allegations are based on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery.

17. Liberty, UPS and other defendants fraudulently violated duties owed plaintiff under the Michigan Uniform Trade Practices Act, MCL 500.2001 et seq, (MUTPA) using the mails and wires in furtherance of their scheme, in violation of 18 U.S.C. 1341 and 1343. MUTPA applies to workers compensation insurance; see MCL 500.2008 and 500.2016. The duties imposed on defendants in the administration of workers compensation claims by the provision of that act required defendants to weigh in good faith the report of a doctor they hired to examine a claimant against the reports and records of a claimant's treating doctors, and all other medical records, where the treating doctor found a work-related disability. The provisions of that act which apply to this action are:

a. MCL 500.2006 **Timely payment of claims or interest.** This section imposes a duty to pay "on a timely basis" to "an individual ...directly entitled to benefits under its insured's contract of insurance..." "Failure to pay claims on a timely basis... is an unfair trade practice unless the claim is reasonably in dispute." The "reasonably in dispute" language imposed a duty on Liberty to weigh in good faith

the report of a doctor they hired to examine a claimant against the reports and records of a claimant's treating doctors, and all other medical records, where the treating doctor found a work-related disability. This section also provides that if benefits are not paid on a timely basis the benefits shall bear simple interest after satisfactory proof of loss was received by the insurer at the rate of 12% per annum.

b. MCL 500.2026 **Course of Conduct.** "[U]nfair or deceptive acts or practices in the business of insurance, other than isolated incidents, are a course of conduct indicating a persistent tendency to engage in that type of conduct and include:

"(d) Refusing to pay claims without conducting a reasonable investigation based upon the available information.

***

(f) Failing to attempt in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear.

c. MCL 500.2062 **False Reports.** "(1) It shall be unlawful; for any person in any report required by law to be made by any insurance corporation.... to make any such statement or report as to fraudulently conceal the real facts."

The Michigan legislature intended these sections of MUTPA to apply to the administration of workers compensation claims because when the legislature wanted a section *not* to apply to workers compensation, it said so; see MCL 500.2006(6).

17 A. Defendants owed plaintiff a duty of *prompt* payment of claims not only under MUTPA, but under the Workers Disability Compensation Act. This duty was stressed by the Michigan Supreme Court said in *McAvoy v H. B. Sherman Co.* 401 Mich 419, 258 NW2d 414

(1977):

> Any worker's compensation schema has, therefore, as its primary goal, the delivery of sustaining benefits to a disabled employee as soon as possible after an injury occurs, regardless of any traditional concepts of tort liability. The objective of the social legislation is to provide the disabled worker with benefits *during* the period of his disability so that the workers and his dependents may survive (literally) the catastrophe which the temporary cessation of necessary income occasions.. [emphasis by the Court]

18. Dr. Drouillard and other cut off doctors who examined the claimants in this case, as well as Liberty, misrepresented to the claimants and the Agency that they were conducting an "independent" medical examination of the claimants; they knew this representation to be false because the doctors intended to write, and Liberty intended to get, reports favoring UPS, Liberty Mutual and other employers and insurers; the doctors lied in their reports; Dr. Drouillard and other cut off doctors each made hundreds of thousands of dollars a year from defendants and employers and insurers similarly situated. Furthermore, Dr. Drouillard and other cut off doctors violated a duty arising under their medical licenses, oaths and standards to truly and honestly examine a claimant and to weigh the results of their examination against the reports and records they possessed from other physicians who had examined or treated the claimant. Dr. Drouillard and other cut off doctors used the mails and wires in furtherance of this scheme, in violation of 18 USC 1341 and 1343,

19. Dr. Drouillard committed fraud for UPS and Liberty Mutual by writing dozens of reports over a period of years (1) stating he examined a claimant or a body part of a claimant when he did not; (2) stating a claimant said something to him which the claimant did not say; (3) stating

a claimant failed to disclose a fact which the claimant did disclose, and or (4) stating dishonestly and without reasonable medical basis that a claimant did not have a work-related disability. Dr. Drouillard was engaged in the business of writing such reports on behalf of MES Solutions, Medical Evaluation Specialists, and other companies which contract with physicians to do forensic medical examinations; he wrote fraudulent reports and gave fraudulent testimony on behalf of other employers and insurers besides UPS and Liberty; in 2004-2008 he earned about $600,000 per year doing forensic exams, writing reports of the exams, and testifying in cases arising out of those exams.

20. A. Defendants' fraud was also accomplished in part by the termination of benefits for stated reasons which were a mere pretext rather than a legitimate basis for denial of benefits.

B. Plaintiffs' damages were proximately caused by defendants' scheme of fraudulently and dishonestly denying workers compensation benefits. Mail and electronic communications were used by defendants in furtherance of the scheme. Defendants' use of mail and electronic communications in furtherance of their scheme of fraud violated 18 USC 1341 and 1343.

C. On information and belief, some of the acts of mail and wire fraud consisted of communications between defendants, or between defendants and the IME "cut off" doctors whose reports defendants relied upon in terminating or denying plaintiffs' benefits, or between defendants and their workers compensation defense attorneys; plaintiffs do not have these communications. On information and belief, UPS and Liberty relied on their Michigan workers compensation attorneys to identify cut off doctors; those attorneys communicated by mail and wire with UPS and Liberty the tactic of using doctors who could be relied on to write a report that would state a worker

10

did not have a work-related disability regardless of the facts, and the attorneys gave to UPS and Liberty the name and contact information for such doctors, such as Dr. Paul Drouillard.  In these communications, UPS and Liberty and perhaps their Michigan attorneys discussed means - such as using cut off doctors like Dr. Drouillard - of cutting off plaintiffs' benefits or forcing them to take settlements at less than true value, even though UPS and Liberty possessed medical reports from treating doctors and doctors chosen by defendants stating plaintiffs did have work-related disabilities.  These allegations are based on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery.

D.  Dr. Drouillard has repeatedly testified in workers compensation cases involving the plaintiffs in this case and other persons that "independent medical examinations" (IMEs) and related depositions are "10 to 15% of my practice," but that testimony was false because IMEs and related depositions either comprised substantially more than 10 to 15% of his earnings or substantially more than 10 to 15% of the time he spent in his practice (earning money from the practice of medicine and doing IMEs and depositions).  From 2003 through 2008 he did about 1,100 examinations per year.

22.      Liberty Mutual and UPS knew from the civil RICO case filed against them in 2003 in the US District Court, Eastern District of Michigan,  by Sherri Yax, et al, Case no 03-72106, that the types of acts described in this complaint might violate RICO, but they continued to do those acts from 2003 to the present.

23.      Defendants' fraudulent scheme was accomplished by use of the United States mails and by electronic communications in violation of 18 USC 1341 and 1343.  These allegations are based on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery.

11

24.  Defendants UPS and Liberty Mutual violated 18 U.S.C. 1962(a) and (b), in that  monies received from the pattern of racketeering alleged herein, in which defendants participated, were used or invested in the operation of the RICO enterprise which engaged in or affected interstate commerce and which proximately injured plaintiffs as alleged herein, or were used to maintain control of any RICO or other enterprise which engaged in or affected interstate commerce.  UPS and Liberty Mutual are liable under the principles of respondent superior and vicarious liability.  These allegations are based on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery.

25.  Dr. Paul Drouillard, as part of a RICO enterprise or by his association with one of the RICO enterprises alleged above, violated 18 U.S.C. 1962(c) in that he participated in the conduct of the enterprise's affairs through a pattern of racketeering activity, and proximately injured plaintiffs as alleged herein.    His illegal conduct is described in throughout this complaint.

26.  UPS and or Liberty Mutual, not as the RICO enterprise but by association with one of the RICO enterprises alleged above, violated 18U.S.C. 1962(c) in that they participated in the conduct of a RICO enterprise's affairs through a pattern of racketeering which proximately injured plaintiffs, making UPS and Liberty liable to plaintiffs for damages, except where they have been released by a plaintiff.   Personnel at UPS and Liberty (such as John Griffith, Jennifer Estrada  and Carmelo Deogracias) violated 18U.S.C. 1962(c) in that they participated in the conduct of a RICO enterprise's affairs through a pattern of racketeering which proximately injured plaintiffs, making UPS and Liberty liable to plaintiffs for damages, except where they have been released by a plaintiff.  These allegations are based on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery.

27.  UPS and Liberty Mutual are liable to plaintiffs under respondent superior and vicarious liability insofar as they have profited or benefitted from their employees' or agents' violations of 18 U.S.C. 1962(c), enterprise, and where Liberty or UPS has not been released by a plaintiff.

28.  **The Pattern of Racketeering**  The pattern of racketeering and some of the particular means of achieving this fraudulent scheme which are known to plaintiffs at this time are described plaintiff by plaintiff in paragraphs 29 A - K.  These allegations are based on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery; for example, precise dates of mailing or faxing or emailing among defendants or their agents are known to defendants and not plaintiffs.  These allegations describe a pattern of racketeering spread over several years, continuing in the present and likely to continue into the future.  Defendants used  mail and electronic communications in furtherance of their scheme to defraud,  violating 18 USC 1341 and 1343.  With regard to each plaintiff, Liberty or its agent used the mails and wires at least five times in furtherance of the scheme to deprive a plaintiff of his or her workers compensation benefits: (1) mailing by Liberty from its Indianapolis IN claims office a notice to the plaintiff to appear for an "independent medical examination" with Dr. Drouillard or another cut off doctor; (2) mailing or faxing or phoning to Dr. Drouillard in Garden City, MI, the notice that a plaintiff would appear before him for the exam; (3) mailing or faxing the doctor's report from Warren or Garden City MI to Liberty at its Indianapolis IN office: (4) mailing by Liberty or its agent from its office in Indianapolis, IN, of the report to the plaintiff; (5) mailing or faxing by Dr. Drouillard, either from his office in Warren MI at MES or from his Garden City MI office, his report to Liberty in Indianapolis IN; (6) mailing the Notice of Dispute by Liberty from its Indianapolis IN office to the Agency in Lansing MI and to the plaintiff (except in the case of Sammy Lewis).  The

13

persons who engaged in the pattern of racketeering are, in addition to the named defendants, the individuals at the Liberty Mutual and UPS workers compensation claims departments who handled Michigan workers compensation claims.  The dates of some of these mailed, emailed or faxed communications are within the possession of defendants.

Paragraphs 12-20 above describe the means and plans by which defendants schemed to defraud the plaintiffs and other similarly situated.

29.  **The Claims of Each Plaintiff and Their Demands for Relief**

29A.   JOHN MILLER.

In June 2005, John Miller was injured working for UPS.   After Liberty Mutual and UPS paid him workers compensation benefits for several months, defendants hired Dr. Paul Drouillard to examine Mr. Miller and write a cut off report.   On or about October 1, 2005, Liberty mailed to plaintiff a notice to appear for an examination by Dr. Drouillard.  Liberty falsely represented to Mr. Miller the examination was an independent medical examination. On October 14, 2005, Dr. Drouillard wrote and mailed a report stating he examined Mr. Miller's cervical spine, measured and examined various parts of Mr. Miller's arms, and concluded Mr. Miller could return to work without restriction.  Dr. Drouillard lied, in that *he did not examine or measure Mr. Miller's neck or arms*, and in concluding Mr. Miller could work without restriction, because that conclusion was made without regard to facts but as part of defendants' scheme to cut off benefits to injured workers.  Defendants used the mails and wires to send this report to Mr. Miller and to each other.   Five days after the report was written, Liberty and UPS cut off plaintiff's workers compensation benefits, mailing a Notice of Dispute to plaintiff and the Agency dated Oct. 19, 2005, stating, "Per the

14

IME of Dr. Drouillard the employee is no longer disabled from his job at UPS and may return to unrestricted duty.  Therefore benefits have been suspended based on this examination." In October and November 2005, Liberty and UPS possessed records from Mr. Miller's treating doctors containing their examination reports and conclusions that Mr. Miller could not work.  At the time of the mailing the Notice of Dispute and in the months thereafter, Liberty and UPS intentionally failed to properly consider or weigh records and reports they had received from plaintiff's treating doctors, because they intended to cut off plaintiff's benefits without a proper weighing of the findings of plaintiff's treaters, and without regard to the findings of plaintiff's treaters.  Defendants' conduct constituted mail and wire fraud in violation of 18 U.S.C. 1341 and 1343.

Defendants' conduct caused plaintiff damages:  causing him to be deprived of workers compensation benefits, and having to pay expenses and attorney fees. WHEREFORE, John Miller seeks judgment of treble damages against defendants jointly and severally plus attorney fees and costs  as provided by 18 U.S.C. 1964, and by other statutes and court rules.

### 29B.   SAMMY LEWIS.

In 2002, Sammy Lewis was working for UPS when he suffered a crush injury to a leg which has required 17 surgeries and has left him, according to his treating surgeon, permanently disabled from the manual labor job he had with UPS.   For years after the injury, UPS and Liberty paid workers compensation benefits to plaintiff.  During that time, plaintiff litigated in the Agency a claim against UPS and the State of Michigan Second Injury Fund, in which he claimed he was entitled to a workers compensation benefit rate

based on dual employment with UPS and Michael Meda Painting Company. On or about Sept 20, 2005, while that litigation was pending, UPS and Liberty Mutual mailed to Sammy Lewis a notice to appear before Dr. Paul Drouillard for an examination which it falsely represented as an "independent medical examination." On Oct. 7, 2005, Dr. Drouillard wrote and mailed and or faxed to Liberty a cut off report, which contained false statements, among them the conclusion that plaintiff could work without restriction, the statement that in the videotape he saw plaintiff lifting "a heavy object" (in fact it weighed 15 pounds and 2 men were lifting it), and that no further treatment was necessary. On or about Oct. 31, 2005, that report was mailed to plaintiff or his counsel. Plaintiff's treating surgeon, who has done about 12 of the 17 surgeries plaintiff has undergone, at that time was on record stating plaintiff could not work without restriction and needed continued care for his severely crush injury. Liberty Mutual and UPS and their employees cut off plaintiff's benefits or maintained a cut off of benefits, relying on Dr. Drouillard's report, and choosing not to assess honestly and in good faith the records and reports of plaintiff's surgeon. Defendants' conduct constituted mail and wire fraud in violation of 18 U.S.C. 1341 and 1343.

Defendants' conduct caused plaintiff damages: causing him to be deprived of workers compensation benefits, and having to pay expenses and attorney fees. WHEREFORE, Sammy Lewis seeks judgment of treble damages jointly and severally against defendants plus attorney fees and costs as provided by 18 U.S.C. 1964, and by other statutes and court rules.

### 29C. SHAWNE HENRY.

Plaintiff was injured working for UPS on April 18, 2006, and was paid workers

16

compensation benefits by Liberty and UPS until she was sent to Dr. Drouillard, who was not a hand specialist. UPS and Liberty could have sent plaintiff to a hand specialist, such as one of the ten hand specialist at Hand Surgery Associates of Michigan, but because they intended not to honestly evaluate plaintiff's condition, they sent plaintiff to Dr. Drouillard, who was known to them to reliably and nearly always write reports finding no work-related disability. The notice of examination sent to plaintiff by Liberty on or about Jan. 2, 2007, used the mails.

Dr. Drouillard examined Shawne Henry on January 24, 2007, and on or about that day he mailed to UPS and Liberty a report stating falsely:

- "She states she was primarily doing paper work."

- "She did not try to bend over and catch" a box which was falling to the floor; she told the doctor that she did try to catch the box as it was falling and the act of catching the box as it was falling jerked her right arm down;

- "Please note this pattern of performance [on grip strength testing with Jamar dynamometer] clearly demonstrates noncompliance with the testing procedure and an attempt to deceive her true abilities with both the left and right hands." Plaintiff did not attempt to deceive and in fact the day before did the same test at physical therapy with results dramatically different than those reported by Dr. Drouillard.

- "There is clear evidence of symptom magnification as she complains of pain with the lightest of touch that involves the forearm." Plaintiff did not magnify her symptoms.

- "She can return to work in her former capacity without restriction." Plaintiff could

17

not return to work without restriction.

• "No further treatment is necessary."   This statement was false and not made in good faith because, inter alia, Dr. Drouillard was not a hand specialist, and an eminent hand surgeon, Dr. Edward Burke, who saw plaintiff 57 days after Drouillard, and who does a great deal of work on behalf of workers compensation insurance companies, opined "that the symptom complex was present in January 2007 [when Drouillard examined plaintiff] since it was part of the presentation that I saw in March of 2007 and the injury occurred in April 2006."   Also, Dr. Burke determined on March 22, 2007 that plaintiff was suffering from a symptom complex involving multiple right forearm pathologies (lateral epicondylitis of the right elbow, radial tunnel syndrome of the right forearm, arthralgia of the right wrist, and neuralgia of the right forearm radial nerve), and that plaintiff needed a CT arthrogram of the elbow, CT arthrogram of the right wrist, and an EMG, and that was unable to use her right hand at work.  After reviewing the film studies, Dr. Burke diagnosed additional pathologies, tear of the triangular fibrocartilage at the right wrist and loose bodies in the right elbow, and he prescribed physical therapy.  He kept her disabled from right hand work until July 25, 2007.

After receiving Dr. Drouillard's report, Liberty Mutual and UPS chose not to fairly, honestly and in good faith assess plaintiff's condition; instead, they immediately cut off benefits, and  mailed to plaintiff a Notice of Dispute stating that benefits were cut off on the basis of Dr. Drouillard's report.   The Notice of Dispute was mailed to plaintiff on or about

Defendants' conduct constituted mail and wire fraud in violation of 18 U.S.C. 1341

18

and 1343.

` Defendants' conduct caused plaintiff damages: causing her to be deprived of workers compensation benefits, and having to pay expenses and attorney fees. WHEREFORE, Shawne Henry seeks judgment of treble damages jointly and severally against defendants plus attorney fees and costs as provided by 18 U.S.C. 1964, and by other statutes and court rules.

### 29D. CHRISTINE SINGLETON.

On October 1, 2007, Christine Singleton was employed by UPS when she struck her foot on an object and fractured a toe. The injury did not heal fully and plaintiff developed complex regional pain syndrome (aka reflex sympathetic dystrophy). UPS and Liberty paid workers compensation benefits to plaintiff after the injury, but in December 2008 they sent plaintiff to Dr. Paul Drouillard for an IME. Dr. Drouillard examined plaintiff and opined, inter alia, "It is my opinion that she can return to work in her former capacity without restriction. No further treatment is necessary." Based on that report, UPS and Liberty cut off plaintiff's benefits. Dr. Drouillard fraudulently reported that at the time of his examination plaintiff "examination of the left foot reveals no inflammation, swelling, erythema or skin discoloration.... There is no swelling, no ecchymosis." This statement was fraudulent because plaintiff did have swelling, redness and discoloration. Dr. Drouillard also stated that plaintiff did not require further treatment; this statement was fraudulent because there was objective evidence present or obtainable at the time of Drouillard's exam that plaintiff did require further treatment, such as the presence of swelling, redness and discoloration, the coldness of the left foot, a positive bone scan, and the relief of pain from

an L2-4 sympathetic nerve block.   Also, Dr. Drouillard did not examine the other foot for comparison.

Relying solely on Dr. Drouillard's report, UPS and Liberty cut off benefits via a Notice of Dispute dated 1/9/08 and mailed to plaintiff on that date.   After that date, and because of their fraudulent scheme to deny benefits without making a fair, honest and good faith assessment of medical information which contradicted the report of Dr. Drouillard, UPS and Liberty failed to re-examine plaintiff or re-consider the cut off of benefits despite having received, inter alia,  the 2008 records and 2008 and 2009 depositions of Dr. Nakleh, which established both disability and the need for continued treatment.   Defendants' conduct constituted mail and wire fraud in violation of 18 U.S.C. 1341 and 1343.

Defendants' conduct caused plaintiff damages:  causing her to be deprived of workers compensation benefits, and having to pay expenses and attorney fees. WHEREFORE, Christine Singleton seeks judgment of treble damages jointly and severally against defendants plus attorney fees and costs  as provided by 18 U.S.C. 1964, and by other statutes and court rules.

### 29E.  DANIEL HONOWAY.

Daniel Honoway was employed by UPS as a package car driver.   He injured his cervical spine on Sept. 21, 2005, while working for UPS.  UPS and Liberty Mutual paid workers compensation benefits for a period of time following the injury. Plaintiff had a C5 through C7 spinal fusion on April 18, 2006.  In 2006 and 2007, Liberty Mutual nurse Jean Toth recommended that plaintiff begin treatment with physiatrist Dr. Gino Sessa; on April 10, 2007, he gave plaintiff permanent restrictions,

20

due to the cervical spine pathology and fusion, of "no overhead work, no lifting more than 50lbs from the ground level on an occasional basis only."   Liberty  and UPS then sent plaintiff for another evaluation of his work abilities; they sent plaintiff to an "IME" on May 9, 2007, with Dr. Steven Geiringer, who wrote that plaintiff had permanent restrictions of no lifting more than 25 to 30 pounds, limited overhead reaching and no overhead lifting.  UPS and Liberty, dissatisfied that Drs. Sessa and Geiringer wrote that plaintiff had permanent restrictions, sought a doctor who would write an opinion that plaintiff did not have permanent restrictions.  They chose Dr. Mayer because he was known to them and to their attorneys to be a "cut off" doctor.  On April 3, 2008, Dr. Mayer wrote and mailed a report stating that plaintiff had no restrictions.   On April 23, 2008, UPS and Liberty mailed to plaintiff and to the Agency a Notice of Dispute and Notice of Compensation Payments terminating benefits "per IME on 4/3/08."   UPS, Liberty Mutual and Dr. Mayer committed fraud in that they did not intend to honestly and in good faith assess plaintiff's true abilities to work, but to cut off his benefits, and they used the mails and wires in furtherance of this scheme.  Defendants' conduct constituted mail and wire fraud in violation of 18 U.S.C. 1341 and 1343.

Due to defendants' fraud, plaintiff has suffered damages consisting of loss of benefits, attorney fees and expenses.  WHEREFORE, Daniel Honoway seeks judgment of treble damages jointly and severally against defendants Liberty Mutual and UPS, plus attorney fees and costs as provided by 18 U.S.C. 1964, and by other statutes and court

21

rules.

### 29F.  DANIEL DIDONATO.

Daniel Didonato was employed by UPS as a package car driver.  He injured his right knee in 2006, stopping work on Feb. 13, 2006.  UPS prepared and on 2/20/06 filed with the Agency an Employer's Basic Report of Injury.  UPS filled out the form as follows:

37.  How did the injury occur?

NORMAL DUTIES OF STEPPING ON/OFF PKG CAR AND WALKING TO DELIVER PKGS

Liberty Mutual approved medical care by orthopedic surgeon Dr. Jeffrey Mendelson.  Mr. DiDonato gave him a history on March 14, 2006, "He has got a several month history of pain in his right knee which began with his actives at work as a UPS driver."  On March 28, 2006, plaintiff returned to Dr. Mendelson, accompanied by a medical case manager hired by Liberty, Cheryl Schura.  At that visit, Dr. Mendelson told Schura that an MRI confirmed a torn meniscus in the right knee, and the tear was related to plaintiff's work activities.  Dr. Mendelson also wrote an office visit note which was sent to Liberty, stating, "He does have a torn meniscus in his right knee, which I believe is related to his activities at work."

Liberty, despite Dr. Mendelson telling its medical case manager that the injury was work related, mailed to the Agency and plaintiff on or about 3/30/06 a Notice of Dispute denying benefits and giving the reason, "injury not work related."  This was fraud.  Liberty and UPS did not have a good faith basis for disputing benefits.

Liberty received in April 2006 the office visit note of March 28, 2006 stating "He does have a torn meniscus in his right knee, which I believe is related to his activities at

work." However, after Mr. DiDonato filed an Application for Mediation or Hearing with the Agency claiming workers compensation benefits for the injury, Liberty denied benefits. Liberty through its attorneys, Lacey & Jones, filed with the Agency a Carrier's Response dated 6/19/06 stating, "Plaintiff has failed to provide any competent, material and substantial evidence to establish injury or aggravation of injury arising out of and in the course of plaintiff's employment." This was fraud. Liberty had knowledge, through Dr. Mendelson's statements to its medical case manager on March 28, 2006, and through the receipt of Dr. Mendelson's office visit note of March 28, 2006, that the meniscus tear was work related. Liberty also violated its duty to handle plaintiff's claim in good faith.

Liberty and UPS, seeking further grounds on which to deny benefits, sent plaintiff to Dr. Paul Drouillard on August 4, 2006 for an IME. Dr. Drouillard mailed a report stating that plaintiff was able to work and his knee problems in 2006 were not work-related. These statements were fraudulent. Liberty and UPS relied on Dr. Drouillard's report and on his deposition of 4/27/07 to deny benefits, and chose not to make a good faith and reasonable assessment of plaintiff's claim because of their fraudulent scheme in which they sought to deny benefits regardless of the facts. Defendants' conduct constituted mail and wire fraud in violation of 18 U.S.C. 1341 and 1343.

Due to defendants' fraud, plaintiff has suffered damages consisting of loss of benefits, attorney fees and expenses. WHEREFORE, Daniel DiDonato seeks judgment of treble damages jointly and severally against defendants Liberty Mutual, UPS and Dr. Paul Drouillard, plus attorney fees and costs as provided by 18 U.S.C. 1964 and by other statutes and court rules.

29G.   ROBERTA CAREVIC.

Because UPS and Liberty have been released from RICO claims, plaintiff sues only Dr. Paul Drouillard.

Roberta Carevic was employed by UPS when on 1/24/03 she injured her right foot and ankle on the job.   UPS and Liberty Mutual paid benefits for a time.  In 2003, UPS and Liberty Mutual sent plaintiff to Dr. Jeffrey Lawley for an "IME."  He opined plaintiff was disabled due to her job-related injury to her foot and ankle.      On July 22, 2004, UPS and Liberty Mutual sent plaintiff for an "IME" to Dr. Michael Holda.  He diagnosed ankle sprain RSD (reflex sympathetic dystrophy, now called CRPS, complex regional pain syndrome), and opined, "she would require a sit down job.  Based on today's examination, the prognosis for her returning to full-time duty unrestricted is guarded.  I do not feel that a functional capacity evaluation is recommended.  Most likely, she has reached maximum medical improvement."    In October 2005, rather than send plaintiff back to Drs. Lawley or Holda for a current status report, and with the intent of getting a cut off report, or with the intent of not making a fair, good faith and reasonable investigation into plaintiff's conditions, as required by Michigan law, UPS and Liberty sent plaintiff to Dr. Paul Drouillard for an "IME."  He examined plaintiff and made a report dated October 14, 2005.  He lied in that report, in that he reviewed the MRI which plaintiff brought to the exam, when in fact he never took the MRI from plaintiff but only reviewed a report of the MRI; he failed to make a reasonable and good faith check of the temperature of the injured foot.  Liberty's medical case manager, Barb Miller, sent plaintiff to Drs. Paul Fortin and Dennis Dobritt, both of whom opined in 2005 and or 2006 that plaintiff was disabled.

Defendants' conduct constituted mail and wire fraud in violation of 18 U.S.C. 1341 and 1343.

Due to defendants' fraud, plaintiff has suffered damages consisting of loss of benefits, attorney fees and expenses.  WHEREFORE, Roberta Caravic seeks judgment of treble damages against Dr. Paul Drouillard, plus attorney fees and costs as provided by 18 U.S.C. 1964 and by other statutes and court rules.

29H.  JANET CONFORTO.

Because UPS and Liberty have been released from RICO claims, plaintiff sues only Dr. Paul Drouillard.

Janet Conforto was working for UPS when on Feb. 9, 2006, she injured her right hand, elbow, biceps  and shoulder when her hand was caught in a conveyor.   UPS and Liberty paid workers compensation benefits.   On or about Sept. 5, 2006, Liberty Mutual, through its Medical Case Manager Jeanne St. Amour, sent plaintiff to Dr. Paul Drouillard for examination.  Dr. Drouillard examined plaintiff on Sept. 8, 2006.  Dr. Drouillard wrote a report of his examination which was mailed to Liberty and by Liberty to plaintiff.   Dr. Drouillard lied in his report, in that he stated he conducted tests which he did not conducted, and in that he concluded plaintiff was able to work without restriction.  Dr. Douglas Yaraschuk accompanied plaintiff at the exam, and can state from personal knowledge that Dr. Drouillard did not do many of the tests he claimed in his report that he did.  Dr. Yaraschuk timed Dr. Drouillard's evaluation at 2 minutes and 38 seconds, and can state that the exams which Dr. Drouillard claimed he did would take 30 to 60 minutes.       Liberty Mutual, through Eileen Lightcap, cut off plaintiff's wage loss benefits on Sept. 11, 2006,

stating in a Notice of Dispute mailed to plaintiff and the agency, "Per our IME, she is full duty."

At the time of the mailing the Notice of Dispute and in the months thereafter, Liberty and UPS intentionally failed to consider or weigh records and reports they had received from plaintiff's treating doctors, because they intended to cut off plaintiff's benefits without regard to the findings of plaintiff's treaters.   Liberty and UPS relied on Dr. Drouillard's report to deny benefits, and chose not to make a good faith and reasonable assessment of plaintiff's claim because of their fraudulent scheme in which they sought to deny benefits regardless of the facts.

Defendants' conduct constituted mail and wire fraud in violation of 18 U.S.C. 1341 and 1343.

Due to defendants' fraud, plaintiff has suffered damages consisting of loss of benefits, attorney fees and expenses.  WHEREFORE, Janet Conforto seeks judgment of treble damages against Dr. Paul Drouillard, plus attorney fees and costs as provided by 18 U.S.C. 1964 and by other statutes and court rules.

## 29I.  ANGELA CONFORTO JONES

Because UPS and Liberty have been released from RICO claims, plaintiff sues only Dr. Paul Drouillard.

Angela Jones (Angela Conforto in 2004) was employed by UPS in a job which involved repetitive lifting of heavy boxes, often overhead and with arms extended.  Around Jan. 14, 2004, she noticed severe pain in her right shoulder at work    UPS and Liberty Mutual sent plaintiff to Concentra Medical Center, which recorded that plaintiff reported,

"She was lifting boxes and felt pain in her right shoulder she was hurt.  She told [supervisor] that the time pain was no bad, so she continued to work.  Pain got worse."   A Concentra doctor examined her and diagnosed "1.  Shoulder strain 2. Bursitis right shoulder.  3 R/O Rotator Cuff Tear.....  THIS IS A RECORDABLE INJURY."   Despite this information, which was mailed to UPS and Liberty, Liberty mailed to plaintiff and the Agency on 2/6/2004 a NOD which fraudulently concluded "injury not work related," and on that basis the claim was denied.  Plaintiff's surgeon, Dr. Eric Borofsky, performed on 5/29/04 an open subacromial decompression and bursectomy of the right shoulder, and diagnosed rotator cuff tear of the right shoulder.   He wrote to Liberty Mutual on June 21, 2004, "This letter is to certify that Angela Conforto's disability is a work related disability.  Her Torn Right Rotator Cuff is due to lifting packages on her job."   Despite receipt of this information, UPS and Liberty continued to fraudulently deny the claim.

Liberty and its Michigan counsel hired Dr. Paul Drouillard to examine Angela.  On 10/28/04 he mailed to Angela a letter stating, "An appointment has been scheduled for you at the request of JOHN GRIFFITH of LIBERTY MUTUAL....I will perform the evaluation. I am an independent doctor."   The letter was fraudulent in that Dr. Drouillard was not an "independent" doctor but was hired and paid by Liberty, not by a person or entity with no financial stake in the outcome of plaintiff's claim; in that Drouillard was paid by Liberty and other workers compensation insurers *millions of dollars* over several years to examine Angela and other workers compensation claimants; in that Dr. Drouillard participated in a scheme to fraudulently and dishonestly deprive plaintiff and, on information and belief, thousands of other workers compensation claimants of their workers compensation benefits.

27

However, plaintiff did not know in 2004 and did not know until much later that the statement by Dr. Drouillard that he was "independent" was a false and fraudulent statement.

Dr. Drouillard did the exam and mailed a report to Liberty dated Nov. 12, 2004, which contained lies.   Concerning her TREATMENT FOLLOWING CONDITION, Dr. Drouillard wrote, "She states her overall improvement as '70 percent better.'"   In fact, plaintiff did not say that, and told Drouillard she had constant pain in her shoulder. Concerning her PRESENT COMPLAINTS, Dr. Drouillard wrote, "She states *she has no pain today, but sometimes* she will get pain on the inside of her shoulder when she reaches overhead. *The pain is occasional,* dull, shooting, aching and burning in nature, slight in intensity."   In fact, Angela told the doctor she had constant pain.  She told him her pain was intense.

Plaintiff did not receive this report.  Liberty mailed it in 2004 or 2005 to her counsel, Mark Littman.   Plaintiff did not receive this report until 2009, and did not know until then that it contained lies.

On or about 12/3/04, Dr. Paul Drouillard mailed to Liberty a supplement report on plaintiff.  compensation benefits through fraudulent medical examination reports.    Dr. Drouillard fraudulently represented that Angela Conforto (now Jones) had no work-related disability.

The statute of limitations regarding plaintiff's claim against Dr. Drouillard is tolled because plaintiff was not in 2004 or 2005 "in a position to discover the existence of a pattern of racketeering activity in addition to the existence... of the injury," *Caproni v Prudential Sec., Inc.,* 15 F3d 614, 619 (6th Cir 1994).

28

At the time of the mailing the Notice of Dispute and in the months thereafter, Liberty and UPS intentionally failed to consider or weigh records and reports they had received from plaintiff's treating doctors, because they intended to cut off plaintiff's benefits without regard to the findings of plaintiff's treaters.   Liberty and UPS relied on Dr. Drouillard's report to deny benefits, and chose not to make a good faith and reasonable assessment of plaintiff's claim because of their fraudulent scheme in which they sought to deny benefits regardless of the facts.

Dr. Drouillard's conduct constituted mail and wire fraud in violation of 18 U.S.C. 1341 and 1343.

Due to Dr. Drouillard's fraud, plaintiff has suffered damages consisting of loss of benefits, attorney fees and expenses.  WHEREFORE, Angela Conforto Jones seeks judgment of treble damages against Dr. Paul Drouillard, plus attorney fees and costs as provided by 18 U.S.C. 1964 and by other statutes and court rules.

### 29J.  MICHAEL BELLEVILLE

Michael Belleville was employed by UPS as a driver when he developed severe low back pain with radiculopathy.   Plaintiff claimed he developed a herniated LS disc due to years of jarring and bouncing in the seat of UPS's trucks, but UPS and Liberty denied the claim.   Plaintiff underwent a lumbar laminectomy in 6/07.   UPS and Liberty entered into a voluntary payment agreement with plaintiff in 2008 for the period of disability 4/30/07 - 9/16/07.   Plaintiff returned to work on 9/16/07 and worked without disability until, on 1/26/08, while employed by defendant, his truck hit a bump, causing severe pain in his low back with radiculopathy down both legs.

On 1/26/08, plaintiff went to UPS's industrial clinic, Concentra Medical Center in Troy, MI.

Concentra recorded, "TODAY'S VISIT IS A NEW INJURY," and its doctor, Cheryl Sulisz, assessed "1. Lumbosacral strain, 846.9 (acute) 2. Herniated disc with radiculopathy at L4-S1 (chronic)," and "ACTIVITY STATUS: No activity. He is medically unable to work." Concentra mailed to UPS and Liberty the Transcription of its 1/26/08 examination and treatment of plaintiff. On 2/6/08, John Griffith of Liberty mailed to plaintiff and the Agency a Notice of Dispute stating "injury not work related," despite having the Concentra records indicating that plaintiff had suffered a work-related injury. Liberty and UPS has used other emails and letters in furtherance of this fraudulent denial. For example, in 2/08, Mr. Griffith called plaintiff and said he and UPS are refusing to pay for the new period of disability beginning 1/26/08 because "it is connected with the first injury," or words to that effect; this telephone statement was made in furtherance of the scheme to defraud plaintiff, because Mr. Griffith knew that Liberty and UPS were clearly obligated by MI law to pay for the new injury even if it was merely a new strain superimposed on a pre-existing condition.

Defendants' conduct constituted mail and wire fraud in violation of 18 U.S.C. 1341 and 1343.

Due to defendants' fraud, plaintiff has suffered damages consisting of loss of benefits, attorney fees and expenses. WHEREFORE, Michael Belleville seeks judgment of treble damages jointly and severally against Liberty and UPS, plus attorney fees and costs as provided by 18 U.S.C. 1964 and by other statutes and court rules.

30. It was the policy of Liberty and UPS to describe the examinations by doctors hired by them as "independent medical evaluations." These statements were false and known to UPS and Liberty to be false, because the examining doctors were chosen by defendants, paid by defendants,

and made large sums of money doing examinations for defendants.

31. **PRAYER FOR INJUNCTIVE RELIEF.** Plaintiffs see equitable relief. They seek an injunction (1) forbidding Dr. Drouillard from doing IMEs for Liberty and UPS; (2) forbidding UPS and Liberty from using a doctor for IMEs who in the overwhelming number of exams does not find a work-related injury; (3) requiring Liberty and UPS to keep detailed and public records of all deliberations and communications regarding every decision (a) to pay or deny workers compensation benefits, and (b) to select a doctor for an examination of a MI workers compensation claimant, and (4) requiring Liberty and UPS to adjust and handle claims as required by the Michigan Insurance Code and the Workers Disability Compensation Act.

**REQUEST FOR CLASS CERTIFICATION**

1. The class of plaintiffs involved in this action are so numerous that joinder of all members is impracticable; on information and belief, the number exceeds fifty.

2. A question of law and fact exists common to the class, namely whether defendants conducted or associated with a RICO enterprise with the aim of fraudulently denying MI workers compensation claimants their benefits.

3. The claims of the plaintiffs are typical of the claims and defenses of the class.

4. The plaintiffs and their counsel will fairly and adequately protect the interests of the class.

5. Prosecuting separate actions by individual class members creates a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the parties opposing the class.

6.  Liberty, UPS and Dr. Drouillard have acted on grounds that generally apply to the class, so that injunctive relief is appropriate respecting the class as a whole.

WHEREFORE plaintiffs pray for certification of this action as a class action.

## JURY DEMAND

Plaintiffs demand a jury trial of all issues triable by jury.


/s/Marshall Lasser
Marshall Lasser PC, by
Marshall Lasser P25573
po box 2579
Southfield MI 48307
(248) 647 7722

C:\wp51\DOCS\UPS\2009RICO\Complaint.wpd