UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SAMMY LEWIS, JOHN MILLER,
SHAWNE HENRY, CHRISTINE SINGLETON,
DANIEL HONOWAY, DANIEL DIDONATO,
ROBERTA CAREVIC, JANET CONFORTO,
ANGELA JONES, and MICHAEL BELLEVILLE,
on behalf of themselves and other persons
similarly situated,

     Plaintiffs,    CASE NUMBER:  09-11059
               HONORABLE VICTORIA A. ROBERTS
v.

DR. PAUL DROUILLARD, UNITED PARCEL
SERVICE, and LIBERTY MUTUAL INSURANCE
COMPANY,

     Defendants.
_____/

## ORDER DENYING DR. PAUL DROUILLARD'S MOTION TO DISMISS

### I. INTRODUCTION

  Plaintiffs sued the United Parcel Service ("UPS"), Liberty Mutual Insurance Co.

("Liberty") and Dr. Paul Drouillard under the Federal Racketeer Influence and Corrupt

Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq.  Before the Court is Dr.

Drouillard's Motion to Dismiss (Dkt. #32).  Dr. Drouillard seeks dismissal on grounds

that the claims against him are barred by the doctrine of witness immunity.  On

December 22, 2009, the Court ordered the parties to brief whether it should apply the

witness-immunity doctrine as defined under Michigan or federal law (Dkt. #39).  Oral

argument was held on February 24, 2010.

  For reasons stated, the motion is **DENIED**.

### II. BACKGROUND

Michigan's Workers' Disability Compensation Act ("the WDCA"), Mich. Comp. Laws ("M.C.L.") § 418.101 et seq., allows employers and insurers to compel applicants for disability benefits to submit to an independent medical examination ("IME"). § 418.385. The law stipulates that if an employee refuses to participate, "his or her right to compensation shall be suspended and his or her compensation during the period of suspension may be forfeited." *Id.* Disputes over compensation and benefits must be referred to the Workers' Compensation Agency ("WCA"), for resolution by a workers' compensation magistrate. § 418.841. If the amount in controversy exceeds $2,000, or if the parties request, the matter must be submitted to mediation or set for hearing. § 418.847.

Plaintiffs are UPS employees whose workers' compensation disability benefits were discontinued. They allege that Defendants operated a scheme to fraudulently terminate or deny legitimate claims for benefits. Plaintiffs allege that one aspect of Defendants' scheme involved sending claimants to so-called "cut-off" doctors, to undergo IMEs. According to Plaintiffs, these physicians wrote IME reports, stating that claimants did not have any work-related disability, whether or not this was true. These reports gave UPS and Liberty a reason to terminate or deny benefits.

Plaintiffs allege that Dr. Drouillard was a "cut-off" doctor who performed scores of IMEs for UPS and Liberty between 2003-2008, and received substantial compensation for his services. Plaintiffs claim that, in his role as an independent medical examiner, Dr. Drouillard testified at hearings before the WCA.

Plaintiffs filed this action under the federal RICO statute, alleging that UPS, Liberty and Dr. Drouillard worked together to defraud claimants of their workers'

2

compensation benefits. Plaintiffs seek certification as a class. The action was assigned

to the Honorable Robert H. Cleland, who eventually recused himself. Before his

recusal, Judge Cleland stayed the case pending the resolution of *Brown v. Cassens*

*Transp. Co.*, 546 F.3d 347 (6th Cir. 2008), *cert. denied*, 130 S. Ct. 795 (2009).

However, Judge Cleland authorized Dr. Drouillard to file a limited motion under Fed. R.

Civ. P. 12(b)(6) on any non-RICO issue, specific to him (Dkt. #31).

On July 20, 2009, Dr. Drouillard filed this motion to dismiss and, alternatively, for

judgment on the pleadings. Dr. Drouillard argues that, pursuant to the doctrine of

witness immunity, he cannot be held civilly liable for performing IMEs and reporting his

conclusions. Since Judge Cleland only permitted Dr. Drouillard to file a motion under

Rule 12(b)(6), the Court construes his motion solely as one to dismiss.

## III. LEGAL FRAMEWORK

### A. Standard of Review

In order to survive a Rule 12(b)(6) motion to dismiss,

> a complaint must contain sufficient factual matter, accepted as true, to
> "state a claim to relief that is plausible on its face." A claim has facial
> plausibility when the plaintiff pleads factual content that allows the court to
> draw the reasonable inference that the defendant is liable for the
> misconduct alleged.

*Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550

U.S. 544, 570 (2007)). When reviewing a motion to dismiss for failure to state a claim,

the district court "must construe the complaint liberally in the plaintiff's favor and accept

as true all factual allegations and permissible inferences therein." *Gazette v. City of*

*Pontiac*, 41 F.3d 1061, 1064 (6th Cir. 1994) (*citing Westlake v. Lucas*, 537 F.2d 857,

858 (6th Cir. 1976)).

**B.     Governing Law**

The witness-immunity doctrine arises entirely from common law.  Like state courts, federal courts maintain a separate body of common law.  Since federal common law is more limited than state common law, there are relatively few areas of overlap; however, when federal and state common law exists with regard to a particular issue, the presiding court must decide which one to apply.

The issue must be addressed here, because Dr. Drouillard relies extensively on both Michigan cases and federal-diversity cases applying state common law.  He also contends that state law should apply because he performed his IMEs in Michigan, pursuant to a state statute.  On the other hand, Plaintiffs mainly cite federal-question cases, which apply federal common law.  None of these cases explains the reasons for its choice of law.

To decide which common law applies, the Court looks to Federal Rule of Evidence 501 for guidance:

> Except as otherwise required . . . , the privilege of a witness . . . shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience. However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness . . . shall be determined in accordance with State law.

This is a civil action under the federal RICO statute, 18 U.S.C. § 1961 et seq. Plaintiffs allege that Dr. Drouillard conspired to participate, and participated in, a pattern of racketeering activity affecting interstate commerce, in violation of § 1962(c) and (d), and that his actions violated the federal mail- and wire-fraud statutes, 18 U.S.C. §§

4

1341 and 1343. Despite Plaintiffs' repeated claims that RICO and the mail-fraud statute "criminalized" Dr. Drouillard's alleged pattern of racketeering, (Pls.' Supp. Br. 18), this case remains a civil one. Plaintiffs also claim violations of certain state statutes – the Michigan Uniform Trade Practices Act, M.C.L. § 500.2001 et seq., and the Michigan Workers' Disability Compensation Act, M.C.L. § 418.101 et seq. – but none of these claims appears directed at Dr. Drouillard. Indeed, this was clarified at the hearing. Therefore, since state law does not govern any element of any claim or defense, the Court applies federal common law. *See Reg'l Airport Auth. v. LFG, LLC*, 460 F.3d 697, 712 (6th Cir. 2006) ("Where . . . the underlying claim is based on federal law, federal common law determines the extent of the [attorney-client] privilege.") (*citing* Fed. R. Evid. 501; *Swidler & Berlin v. United States*, 524 U.S. 399, 403 (1998)).

### C.     Witness-Immunity Doctrine

The doctrine of witness immunity, also referred to as testimonial immunity, is not a free-standing principle, but part of the "cluster of immunities" which, at common law, "protect[s] the various participants in judge-supervised trials." *Butz v. Economou*, 438 U.S. 478, 512 (1978). The emergence of these common-law immunities came with the recognition that –

> controversies sufficiently intense to erupt in litigation are not easily capped by a judicial decree. The loser in one forum will frequently seek another, charging the participants in the first with unconstitutional animus. Absolute immunity is thus necessary to assure that judges, advocates, and witnesses can perform their respective functions without harassment or intimidation.

*Id.* (citations omitted). *See also Mitchell v. Forsyth*, 472 U.S. 511, 521-22 (1985) (given the adversarial nature of the judicial process, "[i]t is inevitable that many of those who

lose will pin the blame on judges, prosecutors, or witnesses and will bring suit against them in an effort to relitigate the underlying conflict.") (citation omitted).

Judicial immunity, the"immunity of judges from liability for damages for acts committed within their judicial jurisdiction," was solidly established at common law. *Pierson v. Ray*, 386 U.S. 547, 553-54 (1967) (*citing Bradley v. Fisher*, 13 Wall. 335 (1872)). Based on the nature of their responsibilities, other participants in judicial proceedings enjoyed similar immunity. *See Imbler v. Pachtman*, 424 U.S. 409, 423 n.20 (1976) (because their judgments were functionally comparable to those of judges, prosecutors and grand jurors were considered "quasi-judicial" officers, entitled to "quasi-judicial" immunity). "In short, the common law provided absolute immunity from subsequent damages liability for all persons -- governmental or otherwise -- who were integral parts of the judicial process." *Briscoe v. Lahue*, 460 U.S. 325, 335 (1983).

In *Briscoe v. LaHue*, the Supreme Court reaffirmed the common-law principle that witnesses, like judges and prosecutors, are absolutely immune from civil liability based on their testimony in judicial proceedings. 460 U.S. at 326. The issue before the Court was whether a police officer who committed perjury during a criminal trial could be held liable for damages under 42 U.S.C. § 1983, for violating the defendant's constitutional rights. *Id.* at 326-27. The Supreme Court responded in the affirmative; after reviewing the doctrine's common-law roots, *id.* at 330-32, the Court emphasized its continuing role in promoting truthful testimony by witnesses:

> A witness' apprehension of subsequent damages liability might induce two forms of self-censorship. First, witnesses might be reluctant to come forward to testify. And once a witness is on the stand, his testimony might be distorted by the fear of subsequent liability. . . . A witness who knows that he might be forced to defend a subsequent lawsuit, and perhaps to

6

pay damages, might be inclined to shade his testimony in favor of the
potential plaintiff, to magnify uncertainties, and thus to deprive the finder of
fact of candid, objective, and undistorted evidence. But the truthfinding
process is better served if the witness' testimony is submitted to "the
crucible of the judicial process so that the factfinder may consider it, after
cross-examination, together with the other evidence in the case to
determine where the truth lies."

*Id.* at 333-34 (*quoting Imbler*, 424 U.S. at 440 (White, J., concurring in judgment))

(citations and footnotes omitted). The Court held that the immunity accorded to judges

and prosecutors should "also apply to witnesses, who perform a somewhat different

function in the trial process but whose participation in bringing the litigation to a just -- or

possibly unjust -- conclusion is equally indispensable." *Id.* at 345-46.

In the Sixth Circuit, witnesses are immune from suit "no matter how egregious or

perjurious that testimony was alleged to have been." *Moldowan v. City of Warren*, 578

F.3d 351, 390 (6th Cir. 2009) (citation omitted). The doctrine of witness immunity also

protects conspiracies to render false testimony; therefore, a plaintiff may not circumvent

absolute immunity by alleging that multiple defendants conspired to commit perjury.

*Macko v. Byron*, 760 F.2d 95, 97 (6th Cir. 1985) (*per curiam*).

*Briscoe* confirmed the continued vitality of the witness-immunity doctrine, but did

little to clarify its scope. In subsequent cases, the Supreme Court laid out certain limits

to testimonial immunity. *See, e.g., Malley v. Briggs*, 475 U.S. 335, 340-41 (1986)

(police officer seeking arrest warrant is a complaining witness, and complaining

witnesses are not absolutely immune from § 1983 claims); *Kalina v. Fletcher*, 522 U.S.

118, 129-31 (1997) (prosecutor who executes a fact certification for an arrest warrant

acts as a complaining witness, and cannot claim absolute immunity).

The circuits have also stepped in to clarify issues that *Briscoe* left unresolved.

*Compare Briscoe*, 460 U.S. at 328 n.5 (declining to address whether witnesses in pretrial proceedings are immune), *with Macko*, 760 F.2d at 97 (absolute immunity bars actions against witnesses in grand jury proceedings); *San Filippo v. U.S. Trust Co. of N.Y.*, 737 F.2d 246 (2d Cir. 1984) (same), *cert. denied*, 470 U.S. 1035 (1985); *Briggs v. Goodwin*, 712 F.2d 1444 (D.C. Cir. 1983) (same), *cert. denied*, 464 U.S. 1040 (1984); *Kincaid v. Eberle*, 712 F.2d 1023 (7th Cir.) (same), *cert. denied*, 464 U.S. 1018 (1983).

Like *Briscoe*, the great majority of witness-immunity cases tend to be civil rights claims against public officials under 42 U.S.C. § 1983. Dr. Drouillard objects that these cases do not govern whether he is entitled to absolute testimonial immunity. If the Court understands Dr. Drouillard's argument correctly, he contends that public officials in § 1983 cases may seek no more than qualified immunity, whereas, in his capacity as a private party, he is entitled to absolute immunity. Essentially, Dr. Drouillard argues that § 1983 cases have no bearing on suits which do not involve public officials accused of depriving others of constitutional rights under color of state law. This argument betrays several misunderstandings about the nature of absolute and qualified immunity. Further background is necessary to address these misconceptions.

The Supreme Court recognizes two kinds of immunity defenses. Absolute immunity attaches to all persons "whose special functions or constitutional status requires complete protection from suit." *Harlow v. Fitzgerald*, 457 U.S. 800, 807 (1982). *See, e.g., Nixon v. Fitzgerald*, 457 U.S. 731 (1982) (the President); *Stump v. Sparkman*, 435 U.S. 349 (1978) (judges); *Imbler*, 424 U.S. at 409 (prosecutors). Despite its name, however, absolute immunity is not without limits: those who enjoy its protections may still be civilly liable for conduct falling outside the scope of their duties. *See, e.g.,*

*Clinton v. Jones*, 520 U.S. 681 (1997) (sitting President is not absolutely immune for unofficial acts committed in his personal capacity before being elected); *Forrester v. White*, 484 U.S. 219 (1988) (absolute immunity for judges does not extend to actions performed in a purely administrative capacity); *Burns v. Reed*, 500 U.S. 478 (1991) (prosecutors are not absolutely immune for investigative conduct unrelated to their role as advocates for the state).

On the other hand, qualified immunity protects "government officials performing discretionary functions, . . . insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818 (citation omitted). "Qualified immunity strikes a balance between compensating those who have been injured by official conduct and protecting government's ability to perform its traditional functions." *Wyatt v. Cole*, 504 U.S. 158, 167 (1992) (citations omitted); *McKnight v. Rees*, 88 F.3d 417, 423 (6th Cir. 1996). The Supreme Court often emphasizes that qualified immunity is the norm, and absolute immunity the exception. *See, e.g.*, *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993); *Malley*, 475 U.S. at 340; *Harlow*, 457 U.S. at 807.

Contrary to Dr. Drouillard's assertion, whether an individual can claim absolute or qualified immunity does not hinge on his capacity as a private party or a public servant. Instead, to determine which type of immunity applies, the Supreme Court employs "a 'functional approach,' which looks to 'the nature of the function performed, not the identity of the actor who performed it.'" *Buckley*, 509 U.S. at 269 (*quoting Burns*, 500 U.S. at 486; *Forrester*, 484 U.S. at 229); *accord Koubriti v. Convertino*, 593 F.3d 459, 467 (6th Cir. 2010). By and large, the people whose functions merit some degree of

immunity tend to be public officials.  However, private individuals may also perform functions imbued with absolute immunity, for instance, when called upon to testify in judicial proceedings.  *Briscoe*, 460 U.S. at 334.  Here, any entitlement to absolute immunity that Dr. Drouillard might have, does not derive from his status as a private party, but from his capacity as a witness, a function historically recognized as integral to the judicial process.  *Id.* at 335.

Dr. Drouillard claims that § 1983 cases are exclusively concerned with issues of qualified immunity.  This is not true.  Courts are often unsure, whether a specific public official is absolutely or qualifiedly immune for his conduct, or not at all.  Indeed, the purpose of the functional test is to resolve this very question.  *See Buckley*, 509 U.S. at 269 ("In determining whether particular actions of government officials fit within a common-law tradition of absolute immunity, or only the more general standard of qualified immunity, we have applied a 'functional approach'"); *Hafer v. Melo*, 502 U.S. 21, 29 (1991) (public official may have only qualified immunity for administrative employment decisions, "even if the same official has absolute immunity when performing other functions.").

Courts usually start by asking if absolute immunity protects the conduct at issue. If the answer is yes, the analysis ends; if not, the courts must determine whether qualified immunity applies.  *See, e.g., Crawford-El v. Britton*, 523 U.S. 574, 586 (1998) ("In *Harlow* . . . , we held that the senior aides and advisors of the President were not entitled to absolute immunity, but instead were protected by a qualified immunity standard" (internal quotes and citations omitted)); *Harris v. Bornhorst*, 513 F.3d 503, 509-16 (6th Cir. 2008) (prosecutor could not claim absolute or qualified immunity for her

10

decision to arrest the plaintiff); *Spurlock v. Satterfield*, 167 F.3d 995, 1004 (6th Cir. 1999) ("Having rejected [the defendant's] argument that he is entitled to absolute testimonial immunity . . . , we now turn to his second . . . argument, that he is entitled to qualified immunity for these acts.").  For this reason, § 1983 cases play an important role in defining the contours of absolute immunity.

This leaves Dr. Drouillard's main argument, that § 1983 immunity determinations apply only to public officials accused of depriving others of their constitutional rights under color of state law.

In *Briscoe*, the Supreme Court stated: "At least with respect to private witnesses, it is clear that § 1983 did not abrogate the absolute immunity existing at common law." 460 U.S. at 334.  Dr. Drouillard reads this as evidence that § 1983 cases do not define the immunity of a private witness sued in his individual capacity.

This argument is unpersuasive.  To understand the true meaning of this statement, it is helpful to consider the progression of the Supreme Court's analysis in *Briscoe*.  The issue before the Court was whether a police officer who gave perjured testimony at trial was civilly liable under § 1983.  The Court started from the basic principle that –

> "the tort liability created by § 1983 cannot be understood in a historical vacuum. . . .  One important assumption underlying the Court's decisions in this area is that members of the 42d Congress were familiar with common-law principles, including defenses previously recognized in ordinary tort litigation, and that they likely intended these common-law principles to obtain, absent specific provisions to the contrary."

*Id.* at 330 (*quoting City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 258 (1981)) (other citation omitted) (omission in *Briscoe*).  The Court reviewed the common law of

1871, and determined that the immunity of private witnesses was well established when Congress adopted § 1983. *Id.* at 330-34. Therefore, the Court reasoned, if Congress had intended to modify the immunity given to witnesses in § 1983 claims, it would have stated so explicitly. *Id.* at 334 ("the common law's protection for witnesses is 'a tradition so well grounded in history and reason' that we cannot believe that Congress impinged on it 'by covert inclusion in the general language before us.'" (*quoting Tenney v. Brandhove*, 341 U.S. 367, 376 (1951))).

Turning to the main question before it, the Court determined that police officers who testify in court are integral parts of the judicial process, like private witnesses, and thus entitled to the same immunity protection. *Id.* at 334-36. Lastly, the Court examined the statute's language and legislative history, and determined that Congress did not intend to treat government officials differently from other witness in § 1983 damage suits. *Id.* at 336-45. Thus, the Court concluded, witnesses in § 1983 actions, whether private parties or police officers, are entitled to the absolute testimonial immunity accorded to them at common law. *Id.* at 345-46.

This close reading of *Briscoe* clarifies the statement upon which Dr. Drouillard relies. By saying that § 1983 "did not abrogate" the common-law immunity for private witnesses, the Court did not mean, as Dr. Drouillard implies, that Congress created a different brand of testimonial immunity, applicable only to public officials in § 1983 proceedings, while leaving untouched the common law pertaining to private witnesses. This interpretation could not be reconciled with the final holding of *Briscoe*. Instead, the Court meant simply that the doctrine of witness immunity, as defined by common law, extends to witnesses accused of violating § 1983.

Accordingly, § 1983 cases do not create a special kind of witness immunity, applicable only in civil rights actions. Instead, the law of witness immunity, as construed by § 1983 cases, applies by default, in all federal claims, unless the underlying statute provides otherwise.

The federal RICO statute does not create an exception to the immunity of witnesses, nor has the Sixth Circuit found any evidence that Congress, in enacting the law, intended to alter or abolish a tradition so firmly rooted in common law:

> Section 1983 was not intended to abolish [the absolute immunity accorded to judges and prosecutors], and we have been given no reason to suppose that RICO was intended to abolish it either. It would be anomalous . . . if officials who are immune from suit for alleged violations of the Constitution itself should be denied immunity from suit for alleged violations of a statute that does not incorporate the Constitution -- particularly a statute as amorphous as RICO.

*Cullinan v. Abramson*, 128 F.3d 301, 308 (6th Cir. 1997) (citations omitted). *See also Linne v. Rideoutte*, 971 F.2d 766, 1992 WL 167993, 1992 U.S. App. LEXIS 28514, at *1-2 (D.C. Cir. 1992) (unpublished table case) ("we reject [the] assertion that Congress, in enacting 18 U.S.C. § 1964, [the civil remedies provision of RICO,] intended to abrogate existing immunities protecting government officials and witnesses from civil damage claims."), *cert. denied*, 507 U.S. 1004 (1993).

The Court concludes that *Briscoe* and its Sixth Circuit progeny govern whether Dr. Drouillard is absolutely immune from Plaintiffs' RICO claims.

## IV. ANALYSIS

Plaintiffs allege that Defendants conspired to defraud them of their workers' compensation benefits in a scheme which involved, among other things, falsifying IME reports. They claim Dr. Drouillard prepared false IME reports, upon which the other

13

Defendants relied in order to deny Plaintiffs' applications for benefits.

According to Plaintiffs' uncontroverted allegations, some reports were prepared during, or in preparation for, administrative proceedings before the WCA; others were made without any proceeding pending or even planned. In some cases, Dr. Drouillard testified before the WCA concerning his medical conclusions; more often, he did not.

Plaintiffs argue Dr. Drouillard is not entitled to immunity as a witness, either for preparing the IME reports or for testifying before the WCA. Dr. Drouillard is equally adamant that his immunity extends to both preparation of reports and testimony. As the party claiming absolute immunity, Dr. Drouillard bears the burden to establish that such immunity is warranted. *Barnes v. Winchell*, 105 F.3d 1111, 1115 (6th Cir. 1997) (*citing Antoine v. Byers & Anderson*, 508 U.S. 429, 432 (1993)).

The Court first considers whether Dr. Drouillard is protected for his testimony before the WCA. Then, the Court addresses the IME reports.

### A.    Testimony in Administrative Proceedings

Plaintiffs argue the rules of witness immunity do not apply in proceedings before Michigan's Workers' Compensation Agency. The Court disagrees.

In *Butz v. Economou*, the Supreme Court held that judges, advocates, and witnesses who participate in administrative proceedings before federal agencies are entitled to absolute immunity. 438 U.S. 478, 512-14 (1978). The Court explained that the immunity which protects participants in judge-supervised trials "stems from the characteristics of the judicial process," not from the location where proceedings occur. *Id.* at 512. The Court cited several factors as characteristic of the judicial process:

(a) the need to assure that the individual can perform his functions without

14

harassment or intimidation; (b) the presence of safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct; (c) insulation from political influence; (d) the importance of precedent; (e) the adversary nature of the process; and (f) the correctability of error on appeal.

*Cleavinger v. Saxner*, 474 U.S. 193, 202 (1985) (*citing Butz*, 438 U.S. at 512). To determine whether absolute immunity applies in a non-judicial setting, a court must review these factors and analyze whether the proceedings at issue are functionally comparable to judicial proceedings. *Id.* at 202-06. *See also, e.g., Mitchell v. Fishbein*, 377 F.3d 157, 172-73 (2d Cir. 2004); *Saavedra v. City of Albuquerque*, 73 F.3d 1525, 1530 (10th Cir. 1996); *Hirsh v. Justices of the Sup. Ct.*, 67 F.3d 708, 715 (9th Cir. 1995); *Mylett v. Mullican*, 992 F.2d 1347, 1353 (5th Cir. 1993).

The Court finds that WCA hearings are the functional equivalent of judicial proceedings. The hearings themselves bear all the hallmarks of the judicial process: they are conducted by a magistrate who, like judges, serves in an adjudicative capacity only; the parties are represented by lawyers, and may call upon, and cross-examine, witnesses and experts; WCA determinations are subject to appeal and judicial review by the Michigan Court of Appeals or the Michigan Supreme Court. Moreover, the public policy considerations which justify absolute immunity in judicial settings also exist in the context of WCA hearings: ensuring that all participants perform their functions without fear of harassment or intimidation; reducing the risk of "second suits" by disgruntled parties; and above all, aiding the ascertainment of truth.

Because WCA proceedings are functionally comparable to judicial proceedings, participants benefit from the same protections as participants in judicial trials. *See, e.g., Laden v. City of Philadelphia*, No. 92-0697, 1992 WL 129784, 1992 U.S. Dist. LEXIS

15

9045, at *2-4 (E.D. Pa. June 8, 1992) (unpublished) (members of an administrative agency which reviews license denials are absolutely immune, as are witnesses who testify before it); *Agi-Bluff Manor, Inc. v. Reagen*, 713 F. Supp. 1535, 1545 n.1 (W.D. Mo. 1989) (the reasoning of *Butz* applies to state administrative proceedings, because they are "just as much like judicial proceedings as are federal administrative proceedings."); *Friedman v. Hall*, No. 85-CV-72940-DT, 1987 U.S. Dist. LEXIS 15696, at *11-15 (E.D. Mich. Jan. 12, 1987) (Zatkoff, J.) (unpublished) (*Butz* applies to administrative proceedings held by Michigan's Office of the Racing Commissioner; judges and witnesses participating in suspension hearing are entitled to absolute immunity), *aff'd*, 843 F.2d 1391, 1988 WL 31553, at *2-3 (6th Cir. 1988) (unpublished table case).

The Court holds that Dr. Drouillard is absolutely immune for testimony before the WCA, just as he would be if he appeared as a witness in this Court.

### B.    IME Reports

Each time an applicant for workers' compensation undergoes an IME, the doctor who performs the examination prepares a report summarizing his or her conclusions. M.C.L. § 418.385.  Plaintiffs state that, under Michigan law, workers' compensation insurers can use IME reports as legal grounds to terminate or deny benefits immediately, unless an administrative proceeding exists or is planned.

Plaintiffs contend that, as part of Defendants' alleged scheme to defraud UPS employees of their benefits, Dr. Drouillard wrote false IME reports stating that claimants did not have work-related disabilities.  Dr. Drouillard argues he compiled the IME reports in his capacity as an expert witness, and therefore, he is absolutely immune from claims

16

relating to their preparation. Plaintiffs disagree; they argue that, regardless of whether WCA proceedings were planned, pending or in progress when Dr. Drouillard wrote the reports, he is not immune from allegations that he intentionally falsified them.

The Court finds three Sixth Circuit cases to be particularly relevant to this dispute: *Alioto v. Shively*, 835 F.2d 1173 (6th Cir. 1987); *Spurlock v. Satterfield*, 167 F.3d 995 (6th Cir. 1999); and *Gregory v. City of Louisville*, 444 F.3d 725 (6th Cir. 2006).

### 1. *Alioto v. Shively*

In *Alioto*, the plaintiff was a police officer who, while investigating a rape, gathered evidence to form a "rape kit." 835 F.2d at 1174. Subsequently, the rape kit disappeared, and a grand jury investigation was launched. *Id.* Several public officials testified against the officer who was charged with falsely swearing and tampering with evidence. *Id.* After a jury found him innocent, the officer sued the officials under 42 U.S.C. § 1983, claiming they conspired to give false testimony to the grand jury. *Id.* In particular, the officer alleged that the conspiracy took place before the officials testified, during the investigation of the charges against him. *Id.* The Sixth Circuit dismissed the suit, on grounds that witness immunity "shields from liability alleged conspiracies to give false and incomplete testimony in judicial proceedings." *Id.* (*citing Macko*, 760 F.2d at 97). In a footnote, the court added:

> Alioto also argued on appeal that the defendants conspired to falsify evidence. *Although the doctrine of witness immunity does not shield from liability alleged conspiracies to falsify nontestimonial evidence*, the only facts asserted by Alioto concern the defendants' alleged conspiracy to give false testimony. Accordingly, this argument is also without merit.

*Id.* at 1174 n.1 (emphasis added).

*Alioto* does not cite other authority, that conspiracies to falsify nontestimonial

17

evidence are not immune from suit.  However, subsequent Sixth Circuit decisions rely on *Alioto* for stating this principle.

## 2. *Spurlock v. Satterfield*

In *Spurlock*, two murder convicts accused a police officer of orchestrating their convictions by conspiring to provide false testimony, and falsely testifying against them at trial.  167 F.3d at 997-99.  In addition, the plaintiffs claimed the officer committed, and conspired to commit, nontestimonial acts, including manufacturing probable cause, fabricating evidence, and bribing an inmate to provide false testimony.  *Id.* at 1002.  The plaintiffs filed suit under 42 U.S.C. §§ 1981, 1983 and 1988, and the United States Constitution.  *Id.* at 1000.  The defendant moved to dismiss on absolute and qualified immunity grounds.  When the district court denied his motion, he appealed.  *Id.*

The Sixth Circuit recognized that, under *Briscoe*, there is no civil liability for testimony provided in judicial proceedings.  *Id.* at 1001.  However, the court noted,

> absolute immunity is the exception rather than the rule, and has traditionally been reserved for those actors "intimately associated with the judicial phase of the criminal process."  Furthermore, the Supreme Court and this court have been reluctant to extend the doctrine to other officials or other situations.

*Id.* at 1003 (*quoting Imbler*, 424 U.S. at 430) (other citations omitted).  Moreover, the court stated, "[in *Alioto*,] we explicitly noted that 'the doctrine of witness immunity does not shield from liability alleged conspiracies to falsify non-testimonial evidence.'  . . . [W]e did not specifically address that issue, however, because Alioto, unlike the plaintiffs here, failed to allege any facts supporting that theory."  *Id.* at 1002-03 (*quoting Alioto*, 835 F.2d at 1174 n.1).

The Sixth Circuit rejected the notion that, simply by providing testimony in a

judicial proceeding, a witness should be absolutely immune from liability for other,

nontestimonial acts.  As the court explained,

> The doctrine of absolute immunity for testimony is a shield to ensure that those individuals intimately involved in the judicial process are able to carry out their responsibilities without the constant threat of vexatious lawsuits, not a sword allowing them to trample the statutory and constitutional rights of others.  By virtue of being a witness, [the defendant] is not entitled to absolute immunity in performing any non-testimonial or pre/post-testimonial acts.  What plaintiffs, in essence, allege here is the fabrication of probable cause, and . . . the fabrication of probable cause cannot be immunized by later providing false testimony.  Obviously, the two alleged acts, manufacturing false evidence and later presenting that false evidence in the form of testimony, are inextricably linked.  Nonetheless, we find that adopting [the defendant's] reasoning would lead to the untenable result that officials who fabricate evidence or manufacture probable cause could later shield themselves from liability simply by presenting false testimony regarding that evidence.

*Id.* at 1003-04.

This excerpt from *Spurlock* bears remarkable resemblance to a passage from

*Buckley v. Fitzsimmons*, although the court does not cite to it.  In *Buckley*, the petitioner

filed a § 1983 action against prosecutors for allegedly fabricating evidence against him.

509 U.S. at 261-62.  The Supreme Court held that prosecutors may claim absolute

immunity in their traditional role as advocates, but not when they act as investigators

searching for evidence to support finding probable cause.  *Id.* at 273.  The Court

specified that subsequent events cannot retroactively transform the nature of an activity

from investigative to prosecutorial:

> A prosecutor may not shield his investigative work with the aegis of absolute immunity merely because, after a suspect is eventually arrested, indicted, and tried, that work may be retrospectively described as "preparation" for a possible trial; every prosecutor might then shield himself from liability for any constitutional wrong against innocent citizens by ensuring that they go to trial.

*Id.* at 276.

Spurlock borrows the Supreme Court's reasoning in *Buckley*, and applies it to witnesses. The Sixth Circuit held that, like prosecutors, witnesses cannot, by their own actions, alter the scope of judicial immunity after the fact. The court concluded that absolute witness immunity does not protect nontestimonial acts allegedly committed before a witness testifies at trial. *Id.* at 1001 (*citing with approval Mastroianni v. Bowers*, 160 F.3d 671, 677 (11th Cir. 1998) (holding that testimonial immunity does not "relate backwards" to "protect [a defendant] for any activities he allegedly engaged in prior to taking the witness stand for his grand jury testimony.")).

### 3.    *Gregory v. City of Louisville*

In *Gregory*, the plaintiff's conviction for rape, attempted rape and burglary was vacated after DNA tests established that hairs recovered at the crime scene were not his. 444 F.3d at 731. The plaintiff filed a § 1983 action alleging, *inter alia*, that several defendants fabricated the evidence used to convict him. *Id.* at 737. Specifically, he claimed that two police officers falsified their notes from the investigation, and that the forensic examiner fabricated the report in which she concluded that his hairs matched those found at the scene. *Id.* The three defendants invoked absolute immunity as witnesses, because they testified at the plaintiff's trial. *Id.*

The Sixth Circuit held that the forensic examiner was not absolutely immune from claims that she falsified her report. The court explained that –

> "Expert" forensic examiners act in an investigatory fashion when they
> interpret and document physical evidence. Under the Supreme Court's
> functional test, the pre-trial investigatory acts by forensic examiners merit
> no more protection under absolute immunity than do other persons
> performing investigatory actions. This Court sees no reason to treat the

20

> intentional fabrication of a forensic report differently from the intentional
> fabrication of a police officer or prosecutor.

*Id.* at 740. The court also reasoned that expert reports exist separately from testimony

provided in judicial proceedings, even if the testimony is consistent with the report.

> [The forensic examiner]'s report exists independently of her subsequent
> testimony. The report is a piece of documentary evidence upon which
> Plaintiff argues that the prosecutors justifiably relied to continue their
> prosecution of Plaintiff. Moreover, as a significant component of the
> documentary record before both the prosecution and the defense, [the]
> report affected the course of the criminal proceedings independent of her
> testimony to its contents.

*Id.* at 741. Finally, the court rejected the argument that expert witnesses who become

involved in a case after probable cause is established are absolutely immune from suit.

*Id.* at 740. Under *Spurlock*'s binding precedent, the court explained, "the fabrication of

evidence is a pretrial, nontestimonial act which does not merit absolute immunity,"

regardless of whether the fabrication occurs before or after the establishment of

probable cause. *Id.*

The court concluded that, although the forensic examiner's testimony was

consistent with her report, she was not absolutely immune from claims that she falsified

pretrial, nontestimonial evidence. *Id.* Applying the same reasoning, the court held that

absolute immunity did not shield the two police officers from claims that they falsified

investigatory notes:

> These acts of fabrication would be pretrial, non-testimonial acts for which
> the officers are not entitled to absolute immunity. Like [the forensic
> examiner]'s report, these notes comprise part of the documentary record
> before the prosecution and defense and affected the course of the criminal
> proceedings independent of any testimony to the notes' contents. . . .
> Their very existence, even if not introduced as evidence at trial, affected
> Plaintiff's criminal prosecution independent of the officers' testimony.

*Id.* at 741.

### 4.    Discussion

As set forth in *Alioto*, *Spurlock*, and *Gregory*, the Sixth Circuit holds that: (1) "the doctrine of witness immunity does not shield from liability alleged conspiracies to falsify nontestimonial evidence," *Alioto*, 835 F.2d at 1174 n.1; (2) "[t]he simple fact that acts may ultimately lead to witness testimony does not serve to cloak these actions with absolute testimonial immunity," *Spurlock*, 167 F.3d at 1001; and (3) expert-witness reports exist independently from the witness's judicial testimony, even if the reports are prepared in anticipation for possible judicial proceedings. *Gregory*, 444 F.3d at 740-41.

These principles are directly applicable to the facts of this case. Plaintiffs allege, and Dr. Drouillard does not refute, that IME reports provide an independent basis upon which to terminate or deny benefits, regardless of physician testimony to the WCA. In effect, the very existence of an IME report affects a claimant's likelihood of obtaining benefits, whether or not administrative proceedings are pending or planned. Therefore, like the forensic report in *Gregory*, Dr. Drouillard's IME reports are nontestimonial, documentary evidence to which absolute immunity does not extend. Moreover, under *Gregory* and *Spurlock*, testifying before the WCA does not retroactively shield Dr. Drouillard from liability for allegedly falsifying IME reports. Lastly, Plaintiffs allege that falsifying IME reports was one aspect of a greater conspiracy to defraud them of workers' compensation benefits; under *Alioto*, testimonial immunity is no defense against such allegations.

Dr. Drouillard cites a number of Michigan cases which, according to him, compel a different result, including: *Dyer v. Trachtman*, 470 Mich. 45, 679 N.W.2d 311 (2004);

22

*Maiden v. Rozwood*, 461 Mich. 109, 597 N.W.2d 817 (1999); and *Bielaska v. Orley*, No.

215286, No. 215287, 2001 WL 755921, 2001 Mich. App. LEXIS 670 (Mich. Ct. App.

Feb. 9, 2001) (per curiam) (unpublished).  However, as discussed above, in

proceedings based on a federal statute, federal common law defines the scope of

witness immunity.  Fed. R. Evid. 501; *Reg'l Airport Auth.*, 460 F.3d at 712.  As a result,

the state-law cases on which Dr. Drouillard relies do not govern here.  *Cf. Morgan v.*

*DaimlerChrysler Warren Truck Plant*, 546 F. Supp. 2d 496 (E.D. Mich. 2008) (Rosen, J.)

(applying Michigan witness-immunity doctrine to decide plaintiff's state-law negligence

claim against IME doctor).

Dr. Drouillard also places heavy emphasis on *Kahn v. Burman*, 673 F. Supp. 210

(E.D. Mich. 1987) (Churchill, J.).  In *Kahn*, an attorney retained to sue Dr. Kahn for

medical malpractice hired Dr. Burman to evaluate Dr. Kahn's performance.  *Id.* at 211.

Dr. Burman compiled his findings in a report, based on which the attorney filed claim

against Dr. Kahn.  *Id.*  During the course of the litigation, Dr. Burman wrote a second

report, which he also submitted to the attorney.  *Id.* at 212.  Dr. Kahn sued Dr. Burman

on various state-law grounds, and Dr. Burman moved to dismiss.  *Id.*  The court held

that Dr. Burman's reports were "relevant" to the underlying judicial proceedings, and

therefore protected by witness immunity.  *Id.*  The Sixth Circuit summarily affirmed "for

the reasons stated in the section of the district court's opinion that addresses witness

immunity."  *Kahn v. Burman*, 878 F.2d 1436 (6th Cir. 1989) (unpublished table case)

(citation omitted).

The Court finds *Kahn* unpersuasive.  First, *Kahn* is a diversity action, which

means Michigan law should apply.  The court says as much, *id.* at 212, but inexplicably

23

relies on federal and Maryland cases to decide the immunity issue. Second, the court's immunity ruling appears to be based solely on the fact that Dr. Burman's reports are "relevant" to the underlying medical malpractice action. However, the Supreme Court makes clear that the scope of absolute immunity is not determined by whether the act or statement in question is relevant to the judicial proceeding, but whether "such immunity is justified for the function in question." *Buckley*, 509 U.S. at 269 (*quoting Burns*, 500 U.S. at 486). Finally, *Kahn* pre-dates *Alioto*, *Spurlock*, and *Gregory*; thus, to the extent that *Kahn*'s holding contradicts these cases, it is no longer good law.

Finally, Dr. Drouillard argues strenuously that allowing Plaintiffs' claims to proceed will have a chilling effect on physicians who perform IMEs, such that fewer doctors will be willing to evaluate the legitimacy of workers' compensation claims. The Court disagrees.

As a preliminary matter, it is important to emphasize that this is not a tort action for damages, like the state cases on which Dr. Drouillard relies. RICO does not offer compensation to persons allegedly injured by the negligence of an IME physician. Instead, these plaintiffs must proceed under state law, and, in Michigan at least, their only recourse is to file claim for medical malpractice. *Dyer*, 470 Mich. at 49-50; *Maiden*, 461 Mich. 133-34. Therefore, doctors who perform IMEs do not face an increased risk of tort-based lawsuits.

Furthermore, rejecting Dr. Drouillard's witness-immunity claim does not create an exception to the doctrine itself. It is beyond dispute in this circuit that absolute immunity does not protect non-testimonial, pre-trial acts of evidence fabrication. The Court simply holds that physicians alleged to have deliberately falsified IME reports are held to the

24

same standard as forensic examiners accused of deliberately fabricating evidence. This ruling does not alter the contours of testimonial immunity, nor does it increase the potential liability of physicians who perform IMEs.

Lastly, the Court finds it unlikely that physicians who conduct IMEs would be reluctant to provide their services to employers and insurers as a result of this decision. Plaintiffs allege, and Dr. Drouillard does not dispute, that a substantial portion of his business consists of performing IMEs for various clients.  (Affidavit of Lisa Fraser, Pls.' Resp. Ex. B.)  Hypothetically, if this decision were to increase the cost of doing business for physicians, they could simply pass this additional cost to their clients, for whom IMEs provide an effective means of weeding out false claims and controlling costs.  For this reason, the Court has no doubt that physicians like Dr. Drouillard will continue to perform IMEs and testify in administrative and judicial proceedings.  For them, "financial interest will overcome any reluctance to come forward based on the lack of absolute immunity; the same cannot be said, for example, for a witness who has no interest in the outcome of a criminal case."  *Todd v. Weltman, Weinberg & Reis Co., L.P.A.*, 434 F.3d 432, 443 (6th Cir.), *reh'g denied, reh'g en banc denied*, 2006 U.S. App. LEXIS 11476 (6th Cir. Apr. 24, 2006), *cert. denied*, 549 U.S. 886 (2006).

## V.    CONCLUSION

Applying Sixth Circuit precedent, the Court holds that Dr. Drouillard is not entitled to absolute immunity for IME reports prepared by him, even when he testifies consistently with those reports before the Michigan Workers' Compensation Agency. However, Dr. Drouillard is absolutely immune from suit for any testimony before the WCA.  The motion is **DENIED**.

**IT IS ORDERED.**

S/Victoria A. Roberts
Victoria A. Roberts
United States District Judge

Dated: March 22, 2010

The undersigned certifies that a copy of this document was served on the attorneys of record by electronic means or U.S. Mail on March 22, 2010.

s/Carol A. Pinegar
Deputy Clerk